Oral Argument Not Yet Scheduled

No. 21-1049

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

TRANSPORTATION DIVISION OF THE INTERNATIONAL ASSOCIATION
OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS,
BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN

Petitioners,

v.

FEDERAL RAILROADADMINISTRATION, and UNITED STATES
DEPARTMENT OF TRANSPORTATION,

Respondents.

_____

OPENING BRIEF OF THE TRANSPORTATION DIVISION OF THE
INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND
TRANSPORTATION WORKERS, BROTHERHOOD OF LOCOMOTIVE
ENGINEERS AND TRAINMEN

_____

LAWRENCE M. MANN
Alper & Mann, P.C.
9205 Redwood Avenue
Bethesda, MD 20817
(202) 298-9191
mann.larrym@gmail.com

KEVIN BRODAR, General Counsel
SMART-TD
24950 Country Club Blvd.
North Olmsted, OH 44070
(216) 228-9400
kbrodar@smart-union.org

JOSHUA D. MCINERNEY, BLET
Barkan Meizlish, LLP
4200 Regent Street, Suite 210
Columbus, Ohio 43219
(614) 221-4221
jmcinerney@barkanmeizlish.com

Attorneys for the Transportation Division of the International Association
of Sheet Metal, Air, Rail, and Transportation Workers, the Brotherhood of
Locomotive Engineers and Trainmen

## Certificate as to Parties, Rulings, and Related Cases

**A.     Parties**

The Petitioners are the Transportation Division of the International Association of Sheet Metal, Air, Rail, and Transportation Workers (SMART-TD), and the Brotherhood of Locomotive Engineers and Trainmen (BLET).

The Respondents are the U.S. Department of Transportation, and the Federal Railroad Administration, which is an agency of the DOT.

**B.     Rulings Under Review**

The Petitioners are challenging a Final Rule of the Federal Railroad Administration in Docket No. FRA-2018-0093-0020, which appears at 85 Fed. Reg. 80544, December 11, 2020.

**C.     Related Cases**

There are no related cases of which counsel are aware.

## Petitioners' Rule 26.1 Disclosure Statement

In accordance with Fed. R. App. P. 26.1 and the corresponding Circuit Rule, Petitioners state that they are not corporations. Rather, Petitioners SMART-TD and BLET are unincorporated associations and labor organizations whose members are individual workers. The Petitioners do not have a parent company; they are not subject to any ownership interest by a publicly held company; and they do not have

members who have issued shares or debt securities to the public.

SMART-TD is the duly recognized collective bargaining representative under the Railway Labor Act for the craft or class of conductors and other train service employees directly impacted by the aforesaid rulemaking.

BLET is the duly recognized collective bargaining representative under the Railway Labor Act for the craft or class of locomotive engineers and other train service employees directly impacted by the aforesaid rulemaking. The crafts or classes of employees represented by these Petitioners comprise the operating crews of trains being operated in interstate commerce and are among those persons who are affected by the FRA actions challenged here.

# TABLE OF CONTENTS

**PAGE**

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES** .................................................................... i

**TABLE OF CONTENTS** ............................................................ iii

**TABLE OF AUTHORITIES** ....................................................... iv

**GLOSSARY** ........................................................................... viii

**JURISDICTIONAL STATEMENT** ............................................. 1

**ISSUES PRESENTED FOR REVIEW** ........................................ 1

**STATEMENT OF THE CASE** ..................................................... 2

**SUMMARY OF ARGUMENT** ..................................................... 8

**ARGUMENT** ........................................................................... 11

**CONCLUSION** ........................................................................ 33

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE**

*Barnhart v. Peabody Coal Co.,* 537 U.S. 149 (2003) .....................................31

*Brock v. Pierce County*, 476 U.S. 253 (1986)..................................................31

*Dolan v. U.S.,* 560 U.S. 605 (2010) ......................................................... 31-32

*Simmons v. ICC,* 716 F. 2d. 40, 42 (D.C. Cir. 1983) ........................................1

*Transportation Division of the International Association of
Sheet Metal, Air, Rail, and Transportation Workers, et. al.,
v. Federal Railroad Administration, et al.,* No. 20-1117,
August 20, 2012 ..................................................................................10,30,32

## LEGISLATION

28 U.S.C. § 2342(7)...............................................................................................1

28 U.S. C. § 2343 ................................................................................................1

28 U.S.C. § 2344 ................................................................................................1

49 U.S. C. § 103(c)........................................................................... 1,2,9,12,16,29

49 U.S. § 20103 ....................................................................................2,8,9,30

49 U.S. C. § 20114(c).......................................................................................1

49 U.S. § 20701 .............................................................................................19

## REGULATIONS

Final Rule (85 Fed. Reg. 80544-80588).....i,1,3-5,7-9,12-13,16-19,21-22,24,26

NPRM (85 Fed. Reg. 2494-2519) ........................................................6,16,19,21

49 C.F.R. § 211.13 ...................................................................10,30

49 C.F.R.§ 211.29 .................................................................1,2,8,11,12

49 C.F.R. § 217(c) ...................................................................15

49 C.F.R. § 218.1 ....................................................................5

49 C.F.R. § 218.22 ...................................................................20

49 C.F.R. § 221.1 ....................................................................5

49 C.F.R. § 221.13 ...................................................................23

49 C.F.R. § 232.205 ...........................................................3,14-15,17-18

49 C.F.R. § 232.207 ..................................................................4

49 C.F.R. § 232.209 .................................................................14

49 C.F.R. § 232.305 ...............................................................24,25

49 C.F.R. § 232.403 .................................................................19

49 C.F.R. § 232.405 ................................................................7,28

49 C.F. R. § 232.409 ................................................................22

FRA-2016-0018-0001 ................................................................14

FRA-2018-0093...........................................................i,4-7,26,21,24,26,28-30

FRA-2018-0011.................................................................................25

FRA-2017-0130.........................................................................5,15,16

FRA-2015-0044.................................................................................22

FRA-2015-0023.................................................................................23

FRA-2013-0030.................................................................................25

FRA-2012-0096.................................................................................22

FRA-2012-0091.................................................................................17

FRA-2009-0015.................................................................................22

FRA-2006-25794...............................................................................19

FRA-2004-18895...............................................................................22

FRA-2004-17989...............................................................................20

FRA-2001-10660...............................................................................20

**MISCELLANEOUS**

NTSB Acc. Rep. No. NTSB/RAR-20105, December 29, 2020
https://www.ntsb.gov/investigations/AccidentReports/Reports/RAR2005.pdf ...29

# GLOSSARY

Add.          Addendum

APA           Administrative Procedure Act

C.F.R.        Code of Federal Regulations

FRA           Federal Railroad Administration

Fed. Reg.     Federal Register

GAO           Government Accountability Office

J.A.          Joint Appendix

NPRM          Notice of Proposed Rulemaking

NTSB          National Transportation Safety Board

Pub. L.       Public Law

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the final agency action of the FRA at issue in this case pursuant to 49 U.S.C. § 20114(c) (Add. 65) and 28 U.S.C. § 2342(7) (Add. 64). These provisions allow any aggrieved party, within 60 days after entry of a final agency order, to file a petition to review the order in the court of appeals where venue lies. 28 U.S.C. § 2344 (Add. 64). Venue of this Court is pursuant to 28 U.S.C. § 2343 (Add. 64). The FRA regulation under review was promulgated on December 11, 2020, and the Petition for Review was docketed on February 3, 2021. The Petitioners are "aggrieved parties" because they represent the employees directly affected by the rule under review. In addition, they were parties to the proceeding under review. *See, Simmons v. ICC,* 716 F.2d 40, 42 (D.C. Cir. 1983).

## ISSUES PRESENTED FOR REVIEW

A.      Whether the Final Rule, which failed to provide an opportunity for a petition for reconsideration, violates 49 C.F.R. § 211.29 (Add. 66).

B.      Whether the Final Rule violates 49 U.S.C. § 103(c) (Add. 64), which mandates that the FRA utilize the highest safety standards in its administration of railroad safety.

C.      Whether the Final Rule, which was promulgated 2 years after the

1

rulemaking was initiated, violates 49 U.S.C. § 20103(b) (Add. 64), which requires FRA to issue a final rule within one year from the date a proposed regulation is initiated.

## STATEMENT OF THE CASE

On July 12, 2018, the Association of American Railroads petitioned the FRA to relieve its member railroads from complying with certain safety regulations regarding brake testing and other matters. On December 11, 2020, the FRA issued a Final Rule wherein it granted the Association of American Railroads' petition. ON February 3, 2021, Petitioners filed this petition challenging the FRA's Final Rule which greatly lessens safety of rail workers.

The final rule failed to provide an opportunity for a petition for reconsideration, which violates 49 C.F.R. § 211.29 (Add. 66). Additionally, the rule changes being challenged here violate 49 U.S.C. § 103(c) (Add. 64), which requires the FRA to utilize the highest degree of safety in administering the railroad safety laws of the United States. Lastly, the time requirements set forth in final rule, which was promulgated almost two and half years after the rulemaking was initiated, violates the express provisions of 49 U.S.C.§ 20103(b) (Add.64), which requires FRA to issue a final rule within one year from the date a proposed regulation is initiated.

As explained by FRA in the Final Rule, 85 Fed. Reg. 80544 (Add. 1), FRA regulations require the air brake systems of trains and the air brakes of individual freight cars to be inspected and tested in certain circumstances. The regulations provide for five primary types of brake system inspections: Class I (initial terminal inspection), Class IA (1,000-mile inspection), Class II (intermediate inspection), Class III (trainline continuity inspection), and the Single Car Test. A Class I air brake test, also referred to as an initial terminal inspection, is a comprehensive inspection of the brake equipment on each car in an assembled train that is required to be performed at the location where a train is originally assembled, when the consist is changed pursuant to 49 C.F.R. § 232.205(a)(2) (Add. 69) (e.g., other than by adding or removing a single car or solid block of cars, removing a defective car, or picking up multiple blocks of cars under the space or trackage constraints referenced by paragraph (b)(2)), and when a train is off-air for a defined number of hours. Class I brake tests help ensure that a train's brakes are in proper working condition and that the train is capable of traveling safely to its destination. A Class I brake test requires the performance of a leakage test and in-depth inspection of the brake equipment (on both sides of the freight car) to ensure that each car's brake system is properly secure, does not bind or foul, and responds by applying or releasing in accordance with a specified brake pipe pressure signal. Piston travel must also be inspected and adjusted to a specified length if found not to be within a

3

certain range of movement.

Further, FRA has mandated "relief from various provisions provided in long-standing waivers related to single car air tests, end-of-train devices, helper service, and brake maintenance" into current safety regulations. 85 Fed. Reg. 80544 (Add. 1). This new regulatory scheme allows railroads to forego certain testing, inspection and maintenance of train brakes.  FRA's stated rationale for the proposed rule is that it would "reduce the overall regulatory burden on railroads." *Id.*

The Association of American Railroads rulemaking at issue requested the FRA to "relax the requirement to conduct a Class I brake test prior to operation if a train is off-air for a period of more than four hours."[1] 85 Fed. Reg. 80544 (Dec. 11, 2020) (Add. 1). The four-hour period has been a long-established time consistent with safety needs. Nevertheless, the Petition for Rulemaking sought to increase the time cars may be off-air <u>without</u> requiring a Class I brake test from 4 hours to 24 hours. *See,* FRA-2018-0093-0002 (J.A. 233). The Association of American Railroads noted that the Petition was filed pursuant to FRA's request. This despite the fact that an Association of American Railroads' Petition for Waiver for the

---

[1] The term "off-air" means that the train's air brake system is not being charged, either by a locomotive or by any other means. *See,* 49 C.F.R. §§ 232.205 (Add. 69) and 232.207 (Add. 75).

very same relief which was filed in December 2017, was denied by FRA. *Id.* at 1, *citing* Docket No. FRA-2017-0130 (J.A. 153). In the Final Rule, FRA granted the petition and extended the off-air period to 24 hours.

FRA went even further in incorporating certain waivers, which are to provide only conditional exceptions in limited settings, into existing rules covering air brake testing. 85 Fed. Reg. 80544. Some of FRA's changes relate to 49 C.F.R. Parts 218 (Add. 67) and 221 (Add. 69), which FRA states are "minimum" regulations. *See,* 49 C.F.R. §§ 218.1 (Add. 67) and 221.1 (Add. 69). Moreover, the changes applicable to Part 232 actually lower regulatory standards.

On August 29, 2019, there was a meeting between representatives from the Association of American Railroads, FRA, Office of Management and Budget, and the Office of the DOT Secretary. *See,* FRA-2018-0093-0001. The Memorandum memorializing the meeting states that its purpose was to discuss American Association of Railroad's proposal to revise brake system safety standards by increasing the time cars may be off-air without requiring a Class I brake test, eliminating rail car set-out and pick-up restrictions, and increasing mileage limits governing when Class I brake tests must be performed. At that meeting, the Association of American Railroads also previewed what it termed an "electronic air brake system" and provided a presentation titled "Air Brake Regulatory Modernization." *Id.*

On January 15, 2020, FRA issued its NPRM responding to the Association of American Railroads petition which proposed codification of existing waivers to brake systems and technical amendments to "reduce regulatory burdens." 85 Fed. Reg. 2494 (Add. 38); FRA-2018-0093-0004 (J.A. 291). A proposed Regulatory Impact Analysis, prepared in December 2019, also was published. *See,* FRA-2018-0093-0005.

The NPRM stated FRA's intention to take two separate actions. One would be to directly address Association of American Railroads' Petition for Rulemaking, which FRA itself had urged, on the question of the length of the "off-air" period. 85 Fed. Reg. 2494 (Add. 38). The other would be to codify into FRA regulations "various long-standing waivers providing conditional exceptions to existing rules concerning air brake testing, end-of-train devices, and helper service." *Id*.

There was significant and strenuous opposition to this proposed rulemaking. In addition to the Petitioners, other organizations and individuals vehemently criticized the proposal.[2] Some of the comments observed that "the proposed revisions would exclusively benefit railroads' profit margins at the expense of safety." FRA-2018-0093-0014 at 2 (J.A. 326).

---

[2] *See,* FRA-2018-0093-0007, -0008, -0009, -0011, -0012, -0014, -0016.

Additionally, the FRA admitted that its Regulatory Impact Analysis could not quantify its claim that "overall safety may be improved due to railroad employees experiencing less risk of common injuries such as slips, trips, and falls by having to perform fewer inspections, which would produce positive safety benefits." 85 Fed. Reg. 80545 (Add. 1).

Petitioners and other organizations pointed out that the same purported improvements could be achieved, without weakening air brake safety standards and risking undetected car defects, by improving inspection and maintenance. FRA-2018-0093-0014 (J.A. 325, 333, 359).

In addition, the Chairperson of the National Transportation Safety Board filed comments focusing on the impact of the communication loss between a locomotive and the end of train device in emergency situations. FRA-2018-0093-0010 at 1-2 (J.A. 320-321). The Chairperson recommended that FRA revise 49 C.F.R. § 232.405 to require a shorter time period between failed head-of-train device and end-of-train device communication checks before declaring a loss of communication to the engineer. *Id.* at 3. He further recommended that the same section should be revised to require that telemetry systems continuously transmit an emergency brake command to the end-of-train device until a confirmation message or a decrease in brake pipe pressure message is received by the head-of-

train device. *Id.* Unfortunately, FRA did not adopt any of the NTSB Chair's recommendations.

The Final Rule also included a number of other changes, in addition to extending various limited waivers into nationwide regulations. This was contrary to 49 U.S.C. § 20103 (Add. 64), which states "The Secretary [of Transportation] may waive compliance with any parts of a regulation prescribed or order issued under this chapter if the waiver is in the public interest and consistent with railroad safety."

## <u>SUMMARY OF ARGUMENT</u>

1.    FRA regulations provide an opportunity for parties to seek reconsideration of a rulemaking. *See,* 49 C.F.R. § 211.29(a), which states that

> Any person may petition the Administrator for reconsideration of any rule issued under this part. Except for good cause shown, such a petition must be submitted not later than 60 days after publication of the rule in the Federal Register, or 10 days prior to the effective date of the rule, whichever is the earlier….

In the Final Rule, FRA made the rule effective upon its publication, thus precluding any petitions for reconsideration that are required to be filed not later than 10 days prior to the effective date of the rule.

8

2.      The FRA acknowledges here that it eased current regulatory safety
restrictions at the behest of the Association of American Railroads which
"requested FRA to relax the requirement to conduct a Class I brake test" and to
codify existing waivers affecting only a single railroad into a nationwide rule. 85
Fed. Reg. 80544. Additionally, FRA said that it was making technical amendments
"to reduce regulatory burdens." *Id.* Such rulemaking is arbitrary, capricious and
exceeds FRA's authority because it violates 49 U.S.C. § 103(c), which states:

> **(c) Safety as Highest Priority.**
>
> In carrying out its duties, the Administration shall consider the
> assignment and maintenance of safety as the highest priority,
> recognizing the clear intent, encouragement, and dedication of
> Congress to the furtherance of the highest degree of safety in railroad
> transportation.

FRA's Final Rule encompasses 18 different Dockets, which we will address to
demonstrate that the regulation relaxed the safety requirements in order to reduce
the regulatory burden on the railroads. As such, the FRA has clearly disregarded
the statutory mandate that it "consider the assignment and maintenance of safety as
the highest priority" in carrying out its duties and reduce the regulatory burden on
the railroads.

3.     The time requirements set forth in Final Rule, promulgated two years after the rulemaking was initiated, violates 49 U.S.C. § 20103(b), which requires FRA to issue a final rule within one year from the date a proposed regulation is initiated. The FRA regulation covering the time to complete a rulemaking is 49 C.F.R. § 211.13 and states:

> … A separate docket is established and maintained for each rulemaking proceeding. Each rulemaking proceeding shall be completed not later than 12 months after the initial notice in that proceeding is published in the Federal Register. However, if it was initiated as the result of the granting of a rulemaking petition, the rulemaking proceeding shall be completed not later than 12 months after the petition was filed as prescribed in §§ 211.7 and 211.9.

Regarding a statutory time violation, this Court, in *Transportation Division of the International Association of Sheet Metal, Air, Rail, and Transportation Workers, et. al., v. Federal Railroad Administration, et al.,* No. 20-1117, August 20, 2021 ("*Transportation Division*"), held that a statutory deadline was not violated because the relevant statute under review "does not specify the consequences for missing a deadline." (Slip Op. 6). That case is clearly distinguishable because, when dealing with railroad safety, it is impossible to "specify the consequences for missing a deadline" without reducing the safety to the public. Placing a sanction upon FRA would only decrease the effectiveness of the Agency's oversight of railroad safety. This Court in *Transportation Division* stated further that "[t]he ordinary remedy for tardiness is to seek an order to

10

'compel agency action unlawfully withheld or unreasonably delayed'." (Slip Op. 6-7). That principle does not apply here because the Petitioners opposed the pending rulemaking.

## **ARGUMENT**

I.    **The FRA Failed to Provide an Opportunity for Petitioners to File a Petition for Reconsideration, Which Violates 49 C.F.R. § 211.29**.

FRA regulations provide an opportunity for parties to seek reconsideration of a rulemaking. *See,* 49 C.F.R. § 211.29(a) (Add. 66). To wit:

> Any person may petition the Administrator for reconsideration of any rule issued under this part. Except for good cause shown, such a petition must be submitted not later than 60 days after publication of the rule in the Federal Register, or 10 days prior to the effective date of the rule, whichever is the earlier….

In the Final Rule, FRA made the rule effective upon its publication, thus precluding any petitions for reconsideration that are required to be filed not later than 10 days prior to the effective date of the rule. By making the rule effective on publication, FRA subverted the right to file petitions for reconsideration that is codified in its own regulations.

It is noteworthy that the rule was issued one month prior to the expiration of the term of office of the previous administration. Given the 11th hour publication of

11

the Final Rule two and a half years after the rulemaking was initiated, the immediate effective date evinces the former Administrator's intent to deprive a new Administrator the ability to rule upon any petitions for reconsideration of the regulation.[3]

Such is in violation of 49 C.F.R. § 211.29.

## II.     The Relaxation by FRA of Safety Rules Violates 49 U.S.C. § 103(c).

The FRA acknowledges here that it eased current regulatory safety restrictions at the behest of Association of American Railroads, which "requested FRA to relax the requirement to conduct a Class I brake test" and to codify existing waivers affecting only a single railroad into a nationwide rule. 85 Fed. Reg. 80544 (Add. 1). Additionally, FRA said that it was making technical amendments "to reduce regulatory burdens." *Id.* Such rulemaking is arbitrary, capricious and exceeds FRA's authority because it violates 49 U.S.C. § 103(c), which states:

**(c) Safety as Highest Priority.**

In carrying out its duties, the Administration shall consider the assignment and maintenance of safety as the highest priority, recognizing the clear intent, encouragement, and dedication of

---

[3] Further support for concluding that FRA deliberately intended to preclude reconsideration can be found in the Preambles to the NPRM and the Final Rule, wherein FRA stated that it "does not intend to terminate any waivers" that were incorporated into the regulations by the Final Rule. 85 Fed. Reg. 80546 (Add. 3).

Congress to the furtherance of the highest degree of safety in railroad transportation.

(Add. 64). Below, Petitioners will discuss each substantive section amended by FRA that reduces safety of the public and employees.

When safety regulations are waived or abandoned, the perceived economic burdens on the railroad actually become genuine safety burdens in the form of risks passed onto railroad workers and the public. FRA cites the Regulatory Impact Analysis accompanying this rule for the principle that "overall safety may be improved due to railroad employees experiencing less risk of common injuries such as slips, trips and falls by having to perform fewer inspections, which would produce positive safety benefits, *though these have not been quantified*." 85 Fed. Reg. 80545 (Add. 2) (emphasis added). FRA claims to quantify everything, so a diminution in the number of slips, trips and falls should be estimated from FRA's assumptions regarding costs and benefits about how many fewer inspections will be done.

Critically, however, these supposed benefits were not quantified; rather, FRA once again merely accepted the claims of the Association of American Railroads without any reliable supporting data.

For example, when the Association of American Railroads applied for a waiver of 49 C.F.R. §§ 232.213, 232.15 and 232.103(f) to use Wayside Wheel

13

Temperature Detectors, it contended that "the [wheel temperature detectors] system would eliminate the potential for injury to inspection personnel due to trips and falls when performing Intermediate Brake Tests." FRA-2016-0018-0001 at 3 (Add. 86). The logical extension of this argument is that all inspection-related slips, trips and falls could be eliminated by doing away with inspections altogether. Such is an absurd proposition on which to justify any reduction in safety inspection standards. This is because a greater risk arises from the undiscovered defects on rail cars that will be allowed to travel, resulting from a reduced inspection schedule—and increase the probabilities of derailment.

A.    **The Six-Fold Increase In the "Off-Air" Period Between Brake Inspections Does Not Increase Safety.**

Prior to the adoption of the rule under review, a train and its cars were required to undergo a 49 C.F.R. § 232.205 (Add. 69) Class I brake test and initial terminal inspection whenever it is at "[a] location where the train is off air for a period of more than twenty four hours." 49 C.F.R. § 232.205(a)(3) (Add.70). Similarly, § 232.209(a) (Add. 76) required that each car or solid block of cars at locations other than the initial terminal receive a Class II brake test unless they have previously received a Class I brake test or been off air for less than four hours. Further, 49 C.F.R. § 232.211(a) (Add. 29) required that each car or solid block of cars that have remained continuously and consecutively coupled undergo a Class III air brake test at a point other than the initial terminal unless they have

been off air for less than four hours. Lastly, § 232.217(c) (Add. 30) required cars tested with yard air that have been off air for more than four hours to be re-tested in accordance with § 232.205 Add. 69).

These safety standards were established by FRA in a 2001 rulemaking that dated back to an Advance Notice of Proposed Rulemaking published in 1992. 66 Fed. Reg. 4104 (Jan. 17, 2001), citing 57 Fed. Reg. 62546 (Dec. 31, 1992). These standards were predicated on FRA's "belie[f] that in certain circumstances the length of time that equipment is removed from a source of compressed air can impact the integrity and operation of the brake system on a vehicle or train." *Id.* at 4122. FRA stated that this was true "[p]articularly in cold weather situations where freeze-ups in train brake systems can occur." *Id.* FRA also acknowledged in the 2001 rulemaking that extended off-air time was an issue "in areas where the potential for vandalism is high due to the location where equipment is left standing." *Id.* Twenty years later, nothing has changed with regard to the safety aspect and these issues continue to be recurring operational concerns.

Nevertheless, in Association of American Railroads' request in FRA-2017-0130-0001 (J.A. 153), it complained that the Class I test for cars off air for more than 4 hours was too restrictive. FRA's Railroad Safety Board correctly denied that petition for waiver because it "would not be in the public interest or consistent with railroad safety" and "amounts to a request for a regulatory change, which would be

more appropriately addressed through the rulemaking process." FRA-2017-0130-0008 at 1 (J.A. 194). Unfortunately, a genuine rulemaking never occurred; indeed, FRA conceded that this portion of the Final Rule was merely a response to the petition and letter dated July 12, 2018, and old data from December 2017, which had already been rejected. *See,* 85 Fed. Reg. 80546.

FRA acknowledges its obligation to regulate "in the public interest and consistent with railroad safety." 85 Fed. Reg. 2496 (Add. 38).  However, as one commenter pointed out, the standard employed here is one designed only "in the economic interests of the railroad and consistent with carrier convenience and higher profits." FRA-2018-0093-0016 at 2 (J.A. 60). The FRA's mission is not to make the railroads more profitable, but rather to guarantee safe operations.

**B.    The Waivers Set Forth Below, Which Reduce Safety, Have Been Extended Nationwide By FRA.**

Turning to the other sections in the Final Rule, Petitioners now address how the expansion of waivers violates 49 U.S.C. § 103(c) (Add.64). Because many of the sections are technical, it is necessary to discuss them in detail.

**1.    Air Flow Method of Monitoring Brake Pipe Leakage**

All train air brake systems experience leakage, and strict limitations on leakage exist to ensure that it does not seriously impair the ability of locomotive and other on-board compressors to keep the brake system fully charged and

16

operational. The maximum permissible brake pipe leakage of 5 pounds per square inch per minute has been the long-standing and well-settled safety standard. 49 C.F.R. § 232.205(c)(1)(i)(D) (Add. 71). For locomotives equipped with a pressure maintaining locomotive brake valve and an operative, calibrated air flow meter, the maximum permissible brake pipe leakage is 60 cubic feet per minute. 49 C.F.R. § 232.205(c)(1)(ii)(B).

In 2012, BNSF Railway petitioned for a waiver of 49 C.F.R. § 232.205(c)(1)(ii); Docket No. FRA–2012–0091 (J.A. 3, 12, 45). The waiver was later extended to include Canadian National Railway, Canadian Pacific Railway, and Union Pacific Railroad. The railroads, through this limited waiver, were permitted to operate trains with leakage of up to 90 cubic feet per minute for distributed power-equipped trains[4] under specified operating conditions and with numerous recordkeeping and transparency requirements. These safeguards and transparency have all been eliminated in the Final Rule. *Compare* 85 Fed. Reg. 80571–80572 (J.A. 28-29) and FRA-2012-0091-0035 (J.A. 223).

FRA admits that greater air compressor power underlies its expansion of the

---

[4] Distributive power is a mid-train or rear end locomotive set capable of remote-control operation from the locomotive unit at the train's head end. Distributive power has traditionally been used on heavy trains to help climb steep grades, and now is used to create trains of 2, 3, or 4 or more miles in length.

waiver. *See,* 85 Fed. Reg. 80555 (Add. 12) ("the use of additional air sources such as [distributive power], … is the fundamental basis of FRA's proposal."). This purported rationale conceals the erosion of the traditional leakage limit of 5 pounds per inch per minute. The equivalent of 90 cubic feet per minute reading on an air flow meter would be leakage of 7½ pound per square inch per minute in a 49 C.F.R. § 232.205(c)(1)(i)(D) test performed on a train not equipped with a pressure maintaining brake valve on the controlling locomotive. Thus, although FRA stopped short of nakedly slashing the standard across the board, the effect of the weaker standard when the control locomotive has an air flow meter is insidious because it permits leakage 50% greater than that specified in the regulation.

Lastly, FRA's position that air flow meters are not appurtenances under the Locomotive Inspection Act, which requires that all locomotive appurtenances be "in proper condition and safe to operate," is without merit. FRA contends that an air flow meter is an optional piece of equipment because its installation is not required on every locomotive. 85 Fed. Reg. 80557 (Add. 14). FRA's rationale is facile. Once an air flow meter is chosen and installed, it is no longer an optional piece of equipment because its use is required when performing an air brake leakage test. Much equipment on a locomotive is optional when initially introduced. One type of brake shoe is optional over another, but that fact does not eliminate the safety requirement that all products on a locomotive must be "in

18

proper condition and safe to operate." *See,* 49 U.S.C. § 20701 (Add. 65) Since air flow meters are located on/in the control stand of the locomotive, regulation of them should reside in 49 C.F.R. Parts 229 and 232. *See a*l*so,* 49 C.F.R.§ 232.5 regarding new definitions.

### 2.    End-of-Train Devices

A dozen waivers related to end-of-train devices were incorporated into the Final Rule. 85 Fed. Reg. 80546 (Add. 3). Many of them involved FRA action that is arbitrary, capricious and/or abusive of the FRA's discretion.

Two of the incorporated waivers (Docket No. FRA–2001–9270 and Docket No. FRA–2006–25794) addressed power sources for end-of-train devices. The NPRM associates these waivers with § 232.403(g)(3). 85 Fed. Reg. at 2496 (Add. 40). The Preamble of the Final Rule cites § 232.403(f)(2) as being the subject matter of waivers. 85 Fed. Reg. 80546 (Add. 3). Both citations to § 232.403 are erroneous, as the 2001 waiver involved what currently is § 232.407(f)(2), and the 2006 waiver involved § 232.403(g)(2).

Moreover, Petitioner BLET opposed the waiver. However, those comments do not appear in the online docket, even though the waiver petitioner responded to BLET's comments. *See,* FRA–2006–25794–0006. FRA's incorporation of these

waivers into the regulations—minus the dozen conditions that had been in effect for two decades—was so slipshod as to be arbitrary and capricious.

FRA also incorporated two other waivers[5] involving end-of-train device battery power supplies and, in the process, significantly reduced workplace safety protections for employees who change the batteries. Prior to these waivers, a railroad was required to provide a utility employee[6] used to perform this work on the rear of a train with blue signal protection in accordance with 49 C.F.R. §§ 218.23 through 218.30, because this task was not among the exceptions provided in § 218.22(c)(5).

Blue signal protection for employees provides an alert to operating crews of work and movements by employees on the ground on or around the equipment. The engineer is notified of the ongoing work by a blue flag on both ends of the track, one hung on the lead locomotive and a blue "light" on the control stand. These warnings keep the engineer aware that they may not move the train and must keep the train in a stationary position. Additionally, the engineer must be aware of the ramifications of the use of train air-controlled slack action.

---

[5] Docket No. FRA–2001–10660 (BNSF) (J.A. 4); Docket No. FRA–2004–17989 (Canadian Pacific Railway) (J.A. 6).

[6] A utility employee is a railroad employee assigned to and functioning as a temporary member of a train or yard crew whose primary function is to assist the train or yard crew in the assembly, disassembly or classification of rail cars, or operation of trains (subject to the conditions set forth in 49 C.F.R. § 218.2).

The NPRM proposed to expand the list of functions "to include battery change-out on rear-end marking or end-of-train devices if the change-out is accomplished without the use of tools." 85 Fed. Reg. 2497 (Add. 41). The objections were several-fold. Because there are different employees at various times and days performing the service, this creates confusion and raises safety concerns. Additionally, there was objection to exempt utility employees from the blue-flag protection:[7]

> If the switch behind the train isn't locked and another crew is free to line the switch, they could inadvertently line a switch into the train being worked upon, exposing the utility employee to unnecessary risk. It is irrelevant in this situation whether the employee is using tools to change the battery. Moreover, the carrier's argument that employees must carry the EOTD to another location to change a battery is a red herring. The work can be performed under blue flag protection, and if a carrier nonsensically requires moving the EOTD to another location merely to avoid complying with blue flag regulations, then it should suffer the consequences of the inefficiency it has chosen in order to evade the regulation.

FRA-2018-0093-0016 at 3 (J. A. 362). Again, FRA essentially summarily and arbitrarily dismissed these arguments. *See,* 85 Fed. Reg. 80548 (Add. 5).

---

[7] A metal sign placed on a track or equipment which signifies employees are working on, under, or between equipment on that track.

21

Four other waivers concerning calibration of end-of-train devices[8] were included in the Final Rule, revising 49 C.F.R. § 232.409(d) (Add. 84), which previously required each end of train device's telemetry equipment be tested by the railroad at least every 368 days for accuracy (and be calibrated, if necessary). 85 Fed. Reg. 80560-561 (Add. 17-18). The manufacturers were granted the waivers previously because they had developed automatic calibration technology, which rendered the 368-day test duplicative and, hence, unnecessary for telemetry equipped with that technology.

When incorporating the waiver, however, FRA went one step too far: the Agency also eliminated the 368-day testing requirement for telemetry devices not equipped with automatic calibration technology, and converted the railroad's burden to test each unit into a manufacturer's burden to annually report (i) the number of transceivers reported as inoperative or otherwise malfunctioning or returned for servicing, and (ii) the number of transceivers reported or returned for service with frequency modulation or transmit power outside of either manufacturer's specifications or FCC-approved specifications. 85 Fed. Reg. 80574 (Add. 31).

---

[8] Docket No. FRA–2004–18895 (Wabtec) (J.A. 96); Docket No. FRA–2009–0015 (Ritron, Inc.) (J.A. 20); Docket No. FRA–2012–0096 (DPS Electronics, Inc.) ( J.A. 93); Docket No. FRA–2015–0044 (Siemens) (J.A.100).

In the former regulation, the prescriptive 368-day testing standard provided full transparency, as rank-and-file railroad workers could ensure compliance upon inspection of an end-of-train device. FRA's decision to deprive railroad workers of this important safety information is arbitrary, capricious and an abuse of the Agency's discretion.

Further, among the functions of an end-of-train device is to display a marker lamp so that a following train can locate the rear of the train that it is following. Prior to the Final Rule, the governing regulation prescribed that the centroid (*i.e.*, the center of mass) of an end-of-train device must be located at a minimum of 48 inches above the top of the rail. 49 C.F.R. § 221.13(d) (Add. 41). In recent years, a pair of manufacturers[9] were granted a waiver from this requirement because they had begun to manufacture devices with centroids significantly lower (41 and 42 inches, respectively) than that required by the regulation. The Final Rule provides the centroid of the marking device must be located above the coupler, where its visibility is not obscured and it does not interfere with an employee's access to, or use of, any other safety appliance on the car.

Petitioners, and others, objected to

---

[9] Docket No. FRA–2015–0023 (DPS) (J.A. 98); Docket No. FRA–2017–0093 (Siemens) (J.A. 187).

the viewing distance metrics of one-half mile and one mile, upon which FRA's proposal seem to be based. [End of train device] visibility serves to warn the crew of a following train of the location of the train they are following. Its intended safety purpose is to provide sufficient warning that the engineer of the following train can stop his train short of a collision. Given the ever-increasing proportion of trains having lengths of 1½ miles or more, neither the one-half mile standard nor the one-mile standard provide sufficient distance for an excessively long train to stop short of the collision point within the sight distance under normal braking conditions.

FRA-2018-0093-0016 at 3 (J.A. 362).

FRA summarized this objection, but failed whatsoever to address it. 85 Fed. Reg. 80549–80550 (Add. 6-7). Thus, the Agency's decision to incorporate the waiver was arbitrary and capricious.

### 3.    Single Car Air Brake Tests

All new or rebuilt freight cars must undergo a single car air brake test— "performed by a qualified person"—prior to being placed or used in revenue service. 49 C.F.R. § 232.305(e) (Add. 79, 84). Thereafter, a single car air brake test must be performed at least every five years, except that the first test must occur with eight years of the date of building or rebuilding. 49 C.F.R. § 232.305(c) and (d). (Add. 80).  This test also must be performed (1) when a car's brakes are cut-out or inoperative or when placed on a shop or repair track, (2) when a car on a shop or repair track has not had a test within the prior 12 months, (3) when the

car's single car brake test information is missing or incomplete, (4) when repairs to certain critical brake components are made, or (5) when the car has certain wheel defects. 49 C.F.R. § 232.305(b).

In 2013, BNSF Railway and Union Pacific Railroad were granted a waiver, which permitted the use of an automated single car test device in lieu of one of the approved testing methodologies specified in 49 C.F.R. § 232.305(a). Docket No. FRA–2013–0030 (J.A. 103). The waiver imposed numerous conditions, including establishment of a testing committee with participation by affected labor organizations, an FRA test monitor, and biweekly reporting of test results. *Id.* at 2–3. Then, in 2018, FRA approved a request from the Association of American Railroads to replace its single car air brake test standard S–486–04 with its updated standard S–486–18. FRA Docket No. FRA–2018–0011 (J.A. 189).

Incorporating the 2018 waiver was unobjectionable as it merely updated an incorporation by reference. However, FRA expanded the use of the automated testing devices in a manner that eliminated the testing committee, as well as Petitioners' right to participate in and oversee this important safety process. And FRA did not stop there, it also enlarged the 12-month periodicity of 49 C.F.R. § 232.305(b)(2) testing to 24 months if the prior test was an automated test, and 48 months if the prior test was a 4-pressure test conducted in accordance with the Association of American Railroads S–4027 standard. 85 Fed. Reg. 80573 (Add.

25

30). By FRA's own admission, this change provides the railroads with a windfall of $170–$204 million. 85 Fed. Reg. 80544–80545 (Add. 2-3).  Again, the FRA's mission is not to increase railroad profits, but to provide safe operations that both benefit the worker and the public.

However, the FRA provided no safety justification for this erosion of a long-standing testing standard. Instead, as part of its justification for the proposed changes, FRA admitted its "understand[ing] that, on a daily basis, thousands of individual freight cars (out of the approximately 1.2 million freight cars in the North American fleet) are overdue for their single car air brake test" and nakedly "request[ed] comment on the effect the potentially eliminating the repair track provision of paragraph (b)(2) *may have on this statistic and any policies to mitigate this potential issue*." 85 Fed. Reg. 2505. (Add. 49) (emphasis added).

The standards were lowered simply to match the industry's lack of attention to the safety standards. As Petitioners and other commenters pointed, "if 'on a daily basis, thousands of freight cars are in violation of current rail safety regulatory requirements, the correct response for the industry's safety regulator is not to move the goalposts by relaxing the requirement; it is to enforce the requirement.  To do otherwise would reward what—given the volume of violations—appears to be willful disregard of the regulations by the industry." FRA-2018-0093-0016 at 8 (J. A. 366).

26

### 4.    Brake Systems for Covered Non-Freight Operations

FRA also has gutted air brake regulations for non-freight operations, such as tourist, scenic, historic, and excursion railroads. The Final Rule essentially permits these railroads to self-regulate, and provides for (1) significant relaxation of current maintenance practices and operating requirements, including the periodic inspection requirements for air brake cleaning, repairing, lubricating, and testing (known in the industry as "clean, oil, test, and stencil"), and (2) extending periodic testing requirements for 26–C and D–22 brake valves by one year. *See,* 85 Fed. Reg. 80562-80564 (J.A. 19-21). This portion of the Final Rule has no valid safety rationale; it is arbitrary, capricious and an abuse of FRA's discretion.

### C.    Additional Changes to Part 232

### 1.    Air Repeater Units

The Final Rule defines an *Air Repeater Unit* as "mean[ing] a car, container, or similar device that provides an additional brake pipe air source by responding to air control instructions from a controlling locomotive using a communication system such as a distributed power system." 85 Fed. Reg. 80570 (Add. 27). Air repeater units function as an integral part of a train's air brake system. Indeed, each unit is required to undergo a 49 C.F.R. § 229.21 daily inspection—the same as a locomotive—whenever an initial terminal brake inspection is performed on the

27

train in which the unit is being used. 49 C.F.R. § 232.205(c)(9); *See,* 85 Fed. Reg. 80572 (J.A. 29). However, FRA arbitrarily determined that these units are not locomotive appurtenances (*Id.,* at 80555-80556), and simply ignored Petitioners' contention that the units should also be required to undergo the same Part 229, Subpart B periodic inspections as locomotive air brake components. FRA-2018-0093-0016 at 3-4 (J.A. 335-336).

## 2.    Extended Haul Trains

The Final Rule also arbitrarily revised 49 C.F.R. § 232.213—governing the operation of "extended haul trains" that are permitted to travel up to 1,500 miles between brake tests—in two ways. 85 Fed. Reg. 80558 (Add.14). First, FRA no longer requires the identity of the types of equipment the trains will haul, significantly decreasing transparency for crewmembers who monitor compliance by the railroad. Secondly, railroads were given the flexibility to designate different inspection and test locations in "emergency" circumstances, which, again, makes oversight more difficult.

## 3.    End-of-Train Device Communication Failures

The NPRM included an expression of FRA's "concern[] with the safety risks associated with the loss of communication events between the controlling locomotive and the end of train device." 85 Fed. Reg. 2505. (Add. 49) In response, the NTSB urged FRA to revise 49 C.F.R. § 232.405 to require a shorter duration

28

between failed communication checks before the engineer is notified, and to require each telemetry system to initiate continuously an emergency brake command transmission until a confirmation message or a decrease in brake pipe pressure message is received. 85 Fed. Reg. 80551 (Add. 8); FRA-2018-0093-0010 (J.A. 320). Petitioners and other commenters further recommended that the revisions include a requirement that trains be brought to a safe stop upon a loss of communication that lasts longer than 4 minutes and 59 seconds. FRA-2018-0093-0016 at 8 (J.A. 366).  Both sets of recommendations flowed from the causal role played by an end-of-train device communication failure in the October 4, 2018 collision of two Union Pacific Railroad trains near Granite Canyon, Wyoming. *See,* NTSB Acc. Rep. No. 2105, December 29, 2020. https://www.ntsb.gov/investigations/AccidentReports/Reports/RAR2005.pdf.

FRA declined to act on the concern it raised, blaming the NTSB and Labor for not having "provided any evaluation of the anticipated impacts of the recommended actions …, estimate of the resulting costs to the railroads and the public, or quantified the safety benefits of the recommended actions." 85 Fed. Reg. 80551 (J.A. 8). This was nothing more than an outright abdication of FRA's 49 U.S.C. § 103(c) (Add. 64) duty to utilize the highest degree of safety in administering the railroad safety laws of the United States.

29

### III. The FRA Violated the Time Requirements Set Forth in 49 U.S.C. § 20103(b).

The time requirements set forth in Final Rule, which was promulgated two years after the rulemaking was initiated, violates 49 U.S.C. § 20103(b) (Add. 64), which requires FRA to issue a final rule within one year from the date a proposed regulation is initiated. The FRA regulation covering the time to complete a rulemaking is 49 C.F.R. § 211.13 (Add. 65) and states:

> … A separate docket is established and maintained for each rulemaking proceeding. Each rulemaking proceeding shall be completed not later than 12 months after the initial notice in that proceeding is published in the Federal Register. However, if it was initiated as the result of the granting of a rulemaking petition, the rulemaking proceeding shall be completed not later than 12 months after the petition was filed as prescribed in §§ 211.7 and 211.9.

In the present case, the rulemaking was initiated by a petition filed on July 12, 2018 by the Association of American Railroads. *See,* FRA Docket No. FRA-2018-0093 (J.A. 233); 85 Fed. Reg. 80544 (Add. 1). The Final Rule was issued almost two and a half years after the initial filing, which is in violation of the above requirements.

This Court, in *Transportation Division of the International Association of Sheet Metal, Air, Rail, and Transportation Workers, et. al., v. Federal Railroad Administration, et al.,* No. 20-1117, August 20, 2021, held that a statutory deadline was not violated because the relevant statute under review "does not specify the consequences for missing a deadline." (Slip Op. 6). This Court relied primarily

30

upon *Dolan v. U.S.,* 560 U.S. 605 (2010), and *Barnhart v. Peabody Coal Co.,* 537 U.S. 149 (2003). *Id.*

In *Peabody Coal*, the Supreme Court was considering the authority of the Social Security Commissioner to "assign each coal industry retiree eligible for benefits under the [Coal Industry Retiree Health Benefit Act of 1992] to an extant operating company – a 'signatory operator' – or a related entity, which shall then be responsible for funding the beneficiary's benefits" after the statutory deadline of October 1, 1993. *Peabody Coal*, 537 U.S. at 149. By failing to act by that date, the Commissioner no longer had jurisdiction to take any action, and the employees in question would never receive a placement, leaving them with no retiree benefits or forcing taxpayers to provide them. *Id.,* at 158.

The Court also discussed its previous decision in *Brock v. Pierce County*, 476 U.S. 253 (1986), where it was reviewing the authority of the Secretary of Labor to conduct an audit of a grant recipient outside of 120 days of receiving a complaint in violation of the Comprehensive Employment and Training Act. *Id*.

In both *Pierce County* and *Peabody Coal*, the Court upheld the agency action findings that the agency's responsibility was "substantial," that the ability to complete it within the statutory mandated time period was subject to factors beyond its control, and that invalidating the agency action "would prejudice the

rights of the taxpaying public." *Pierce County*, 476 U.S. at 261; *See also, Peabody Coal*, 537 U.S. at 158.

However, none of the concerns expressed by the Court in *Peabody Coal* or *Pierce County* apply here. This case involves a standard rulemaking and there were no factors beyond the FRA's control in its delay. No burden falls on the taxpaying public, unlike in *Pierce County* where taxpayer money may have been lost forever without the Secretary being able to audit grants given, nor in *Peabody Coal* where taxpayers would potentially be required to pick up the cost of funding eligible employees' retirements. As a result, *Pierce County* and *Peabody Coal* are not applicable here. Additionally*, Dolan* involved a question regarding a court's jurisdiction to determine restitution owed to a victim of a crime beyond the 90-day requirement contained in the Mandatory Victims Restitution Act, not an administrative agency involved in a rulemaking.

Even more problematic in the *Transportation Division* case, when dealing with railroad safety it is impossible to "specify the consequences for missing a deadline" without reducing the safety to the public. Placing a sanction upon the FRA would only decrease the effectiveness of the Agency's oversight of railroad safety.

This Court, in *Transportation Division,* stated further that "[t]he ordinary remedy for tardiness is to seek an order to 'compel agency action unlawfully

withheld or unreasonably delayed'." (Slip Op. 6-7). That principle does not apply

here because the Petitioners opposed the pending rulemaking.


## **CONCLUSION**

For these reasons, the FRA Final Rule issued in violation of 49 U.S.C.§§

103 (c) and 20103(b), and 49 C.F.R. § 211.13, should be vacated.

Respectfully submitted,


/s/Lawrence M. Mann

Lawrence M. Mann                    Kevin Brodar, General Counsel
Alper & Mann, P.C.                  SMART-TD
9205 Redwood Avenue                 24950 Country Club Blvd.
Bethesda, MD 20817                  North Olmsted, OH 44070
(202) 298-9191                      (216) 228-9400
mann.larrym@gmail.com               kbrodar@smart-union.org

Joshua D. McInerney, BLET
Barkan Meizlish, LLP
4200 Regent Street, Suite 210
Columbus, Ohio 43219
(614) 221-4221
jmcinerney@barkanmeizlish.com

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitations of Fed. R. App. P.32(a)(7)(B) because this brief contains 8,149 words, excluding part of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman.

## Certificate of Service

I hereby certify that on this 105th day of November, 2021, I electronically filed the foregoing Petitioners' Opening Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Lawrence M. Mann
Lawrence M. Mann